Larry **WINKLER**, Plaintiff/Appellee,

v.

**FLEETLINE PRODUCTS, INC.,**
**Defendant/Appellant.**

Court of Appeals of Tennessee,
Western Section at Nashville.

April 2, 1993.

Application for Permission to Appeal
Denied by Supreme Court
June 28, 1993.

William R. Goodman, III, Springfield, for defendant-appellant.

Fred E. Cowden, Jr., Nashville, for plaintiff-appellee.

TOMLIN, Presiding Judge, Western Section.

Both plaintiff and defendant take issue with the judgment rendered in favor of plaintiff in this non-jury contract case. Larry Winkler ("plaintiff"), a manufacturer's representative, sued his former employer, Fleetline Products, Inc. ("defendant"), seeking to recover commissions on sales made on behalf of defendant follow-

ing the termination of plaintiff's employment. Plaintiff also sought commissions from the date of his discharge until the date of filing of this suit. The Chancellor awarded plaintiff a judgment in the amount of $6722.70.[1] On appeal, defendant presents two issues for our consideration: whether (1) the employment of plaintiff was terminable at will by defendant; and (2) defendant is obligated to pay plaintiff a commission on orders placed with and accepted by defendant following the termination of plaintiff's employment. As an additional issue, plaintiff contends the trial court erred in denying him commissions on orders placed post-termination by a plaintiff-procured customer who was in bankruptcy. We find no error in the action of the trial court except for denying plaintiff the post-termination commissions.

Defendant operates a manufacturing plant, engaged primarily in the manufacture of metal and plastic parts for tractor-trailer trucks. In 1987, defendant installed a powder coating process for the purpose of painting these parts. After this process had been installed and was in operation for a time, defendant determined that the coating process had an excess capacity and decided to seek customers to take up the slack. Defendant hoped to generate a profit with this excess capacity.

Plaintiff was a manufacturer's representative, engaged in selling cleaning supplies and industrial chemicals to various customers, including defendant. Inasmuch as plaintiff's business put him in contact with many manufacturing companies that could be potential customers of defendant's dry painting process, defendant's president approached plaintiff about becoming a representative of defendant for the purpose of obtaining customers.

It was agreed that plaintiff would seek to procure customers for defendant's paint process. In addition to procuring these customers, plaintiff also agreed to service the accounts. In exchange for these services, defendant agreed to pay plaintiff a 10% commission on all painting work performed for these customers after defendant was paid.

At the beginning of this relationship, defendant asked plaintiff to sign a written agreement, which provided that defendant had the right to terminate the agreement at will upon thirty days' written notice. Because of the 30 day termination provision, plaintiff refused to sign a written agreement. However, the parties began to operate under the other terms and provisions set forth orally. The parties operated on this basis from February, 1988 to September 15, 1989. On that date, defendant, through its president, sent the following letter to plaintiff:

It is with much regret that I must terminate the contract between Fleetline Products, Inc. and Larry Winkler effective October 15, 1989.

I would like to thank you for your efforts and wish you the very best in the future.

During the course of his employment, plaintiff secured five regular customers for defendant, who from time to time sent products to defendant to be painted. The record reflects that once a customer was secured by plaintiff, it was the role of defendant and customer to agree upon a unit price for the items to be painted. Thereafter, the customer would send products to defendant for painting. The unit charge agreed upon by defendant and customer at the inception of their relationship was the amount charged by defendant. Once the job had been completed, the customer was billed. Upon payment of its bill, plaintiff was paid his 10% commission. Obviously, plaintiff did not continue to service any of these accounts after October 16, 1989.

At trial, it was established that for the period of October 16, 1989, to the date of trial (mid-December, 1991), defendant had been paid for painting done for three plain-

1. As a result of an accounting error, defendant failed to pay plaintiff a commission on payments received by it from a customer involved in the dispute in the amount of $14,952.96. It was stipulated at trial that plaintiff was entitled to a 10% commission on this amount, irrespective of any judgment.

tiff-procured customers the sum of $160,936. There was also testimony at trial that sometime after plaintiff's termination one customer, G.F. Furniture ("GFF"), had gone into bankruptcy. As a result of this, the outstanding balance then owed defendant by GFF in the amount of $25,771.60 was written off as uncollectible. This amount, however, does not figure into this controversy as plaintiff claims no commission on it.

Either while GFF was in bankruptcy or after bankruptcy but within the time frame stated above, defendant continued to paint GFF's products but on different financial terms. Defendant's president testified that in an effort to recoup some of the money lost due to GFF's bankruptcy, the per unit price charged GFF was substantially increased, and GFF was placed on a C.O.D. basis, rather than being extended credit. The record reflects that these post-bankruptcy payments to defendant by GFF totalled $93,673.40.

In his memorandum opinion, the Chancellor stated:

The plaintiff is due to be paid his commission as claimed save for any work done for G.F. Furniture after the bankruptcy. Bankruptcy changed the relationship and business done thereafter was not a full product of Mr. Winkler's efforts. There is also an agreed sum due for work in the thirty day period subsequent to notice of termination.

## I. THE NATURE OF PLAINTIFF'S EMPLOYMENT

■ A conversion of defendant's issue from a question to a statement reads as follows: "An oral agreement between a manufacturer and an individual acting as a sales and account representative that does not have a stated term of duration is terminable at will." This is a generic statement that in and of itself is not always applicable. We are of the opinion that defendant has confused a suit for the recovery of commissions under certain circumstances by a terminated sales representative, with a suit for termination of employment itself. Plaintiff does not challenge

the right of defendant to terminate him as its representative. He only seeks commissions for repeat orders for the painting of items from customers he secured.

Plaintiff was an employee at will and was subject to being terminated at any time by defendant. This does not mean, however, that defendant had the right to withhold commissions rightfully due to plaintiff. Defendant installed a painting process for its own use that it found to have a substantially greater capacity than needed. In order to recoup some of its costs, and thereby increase its profits, it employed plaintiff to find in a certain geographic area manufacturers of products that needed to be painted. In essence, plaintiff was a "procurer." He procured five customers who needed to have products painted. These customers and defendant negotiated the unit price for their respective painting operations. From the inception of the oral agreement until the termination of plaintiff's employment, defendant paid plaintiff 10% of all monies paid to it by companies whose products were painted by defendant and thereafter by these customers.

Plaintiff does not contest that pursuant to his arrangement with defendant it was his obligation to "service" these accounts. This meant troubleshooting any complaints concerning the quality or manner in which defendant's customers' products were painted. Granted, he did not service any of these accounts after his final day of employment for the simple reason that he was no longer employed by defendant and did not have the right to do so. From reading this record we are of the opinion that while servicing was involved, the procurement of the customer was the major purpose and servicing was a minor element.

In the case under consideration the parties were free to contract as they saw fit regarding residual commissions. There is not one shred of evidence in this record to indicate that the termination of plaintiff's employment was in any way brought about by any act of misfeasance or malfeasance on the part of plaintiff. Defendant's president gave conflicting testimony as to why

plaintiff was terminated. From reading the record it appears to this Court that defendant observed that it had the business coming in (as procured by plaintiff) as well as the in-house capability of servicing the accounts, and saw no reason to continue to pay out 10% commission on a regular basis to plaintiff.

The authorities cited by defendant in support of its first issue are inapplicable. They all deal with the issue of whether or not a person's employment was for a specified term or at will, which we have already noted is not the issue before us. The Chancellor did not err in ruling that plaintiff was entitled to commissions on the revenue generated. *See E.F. Higgins, Inc. v. Kuhlman Die*, 663 S.W.2d 318 (Mo.App.1983); *Watson v. Wood Dimension, Inc.*, 209 Cal. App.3d 1359, 257 Cal.Rptr. 816 (1989).

## II.   COMMISSIONS FOR THE G.F.F. ACCOUNT

The Chancellor awarded plaintiff all post-termination commissions on repeat orders by customers procured by plaintiff with the exception of painting done for GFF after its bankruptcy. It appears from the Chancellor's opinion that he felt that the bankruptcy of GFF somehow changed the relationship between it and defendant. We respectfully disagree with the Chancellor. GFF was the same company, operated by predominantly the same people after bankruptcy as it was before bankruptcy when it was doing business with defendant. The only thing that the bankruptcy did was to change the financial arrangement between defendant and GFF.

At no time during the course of the entire agreement between plaintiff and defendant did plaintiff play any role whatsoever in setting the price to be charged the customer by defendant. As we have noted, defendant and customer negotiated a per unit price, and thereafter it was on this basis that the customer was charged and plaintiff was paid his 10% commission. After incurring a $25,000 bad debt from GFF due to bankruptcy, defendant continued to paint GFF's products just as it had done before, with two exceptions, neither of which should alter defendant's obligation to plaintiff. We are of the opinion that these exceptions created a distinction without a difference. Plaintiff is entitled to his 10% commission on the repeat sales of defendant's painting services utilized by GFF following bankruptcy. The record reflects that these excluded sales amounted to $93,-673.40. Plaintiff's commission on these sales of 10% would thus be $9367.34.

Accordingly, plaintiff's judgment awarded by the trial court of $6,722.70 is modified. We hold that this judgment should be increased by the above stated amount of $9,367.34, for a total judgment of $16,-090.04. Costs in this cause on appeal are taxed to defendant, for which execution may issue if necessary.

HIGHERS and FARMER, JJ., concur.