# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
October 5, 2000 Session

## LAWRENCE O. WESTFALL v. BRENTWOOD SERVICE GROUP, INC.

**Appeal from the Chancery Court for Bradley County**
No. 97-181     Jerri Bryant, Chancellor

**FILED NOVEMBER 17, 2000**

**No. E2000-01086-COA-R3-CV**

---

Lawrence O. Westfall filed suit against his former employer, Brentwood Service Group, Inc., seeking payment of post-employment commissions allegedly due him.   The defendant counterclaimed for breach of a non-competition/non-disclosure agreement. Following a bench trial, the court below awarded post-employment commissions to the plaintiff and dismissed the defendant's counterclaim, finding that the parties had not agreed to the non-competition/non-disclosure agreement.  The employer now appeals, claiming that the plaintiff is not entitled to post-employment commissions and that the trial court erred in failing to enforce the parties' alleged non-competition/non-disclosure agreement.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and D. MICHAEL SWINEY, J., joined.

J. Christopher Hall and Jane M. Stahl, Chattanooga, Tennessee, for the appellant, Brentwood Service Group, Inc.

Marvin Berke, Chattanooga, Tennessee, for the appellee, Lawrence O. Westfall.

### OPINION

### I.

The defendant, Brentwood Service Group, Inc. ("BSG"), provides payroll funding and administrative services to the temporary help industry.  The plaintiff, Lawrence O. Westfall, went to work as a salesman for BSG in mid-1992.  Westfall's sole employment responsibility was to procure customers for BSG.  After a customer signed a contract with BSG, Westfall had no more duties with respect to that client.

On November 30, 1992, Westfall authored a letter detailing his understanding of his compensation arrangement. The letter states, in pertinent part, as follows:

> I am confirming acceptance of the salary/commission structure that we discussed today. I will receive a $30,000 annual base/draw with a commission 3/4 of one percent or .75% of gross billings production the first year for a new company and 1/4 of one percent or .25% of gross billings production for the second year for that same company.
>
> We will review each quarter against my $30,000 base/draw and at anytime during any quarter that commision [sic] is earned in excess of $30,000 annualized or $7500 a quarter, commission will be paid.

The letter, acknowledged and signed by BSG's president, does not explicitly address what is to occur in the event Westfall ceases to be employed by BSG.

Westfall's base pay was subsequently increased from $30,000 to $36,000. It is undisputed that he remained on the same commission structure, except the parties agree that the $36,000 figure replaced the lesser figure in all phases of his employment compensation scheme.

Each week, Westfall would receive a check for his base pay, regardless of the commissions that he had generated. In addition, if his commissions exceeded his base pay, he would receive an additional check for the commissions. If, on the other hand, the commissions generated by him fell below the amount of his base check, the difference would be recorded. Westfall would then be required to make up, by way of new commissions, any accumulated deficit plus the amount of the current base amount due him before he would be entitled to another commission check. He would receive his base pay regardless of the amount of his commissions.

Approximately six months after Westfall went to work for the company, BSG asked Westfall to sign a non-competition/non-disclosure agreement. Westfall made several changes to the document proffered to him by the company and returned it to BSG. Westfall testified at trial that John Fanning, then the chairman of Uniforce, the owner of BSG, informed Westfall that the modifications were not acceptable. The agreement, *signed only by Westfall,* was apparently placed in Westfall's employment file. When Westfall submitted it to BSG, he affixed the words "with notations as amended" adjacent to his signature.

In January, 1996, BSG informed Westfall that all sales personnel would be responsible for "one quarter of the loss" in the event a customer's account resulted in a "write-off." In response, Westfall tendered his resignation, but advised that he would work out a 30-day notice. A day or two after Westfall tendered his resignation, he returned to work to serve out his notice. He began what he referred to as "weekly maintenance" in BSG's constantly-changing customer databases. When Westfall returned from lunch that day, his office was locked and the computer keyboard was missing. His supervisor suggested that he not serve out his notice and then helped him carry his

belongings to his car. At the car, Westfall gave a backup tape and a disk containing customer information to his supervisor. When he returned a few weeks later to pick up his check, he was asked several questions relating to the customer databases. Westfall initially agreed to allow representatives of BSG to accompany him to his house to check his personal home computer for BSG customer information, but refused when BSG declined Westfall's request to run an errand first.

Apparently, Westfall's supervisor sent a memo to Fanning detailing why Westfall was told not to finish serving out his notice. The supervisor was deposed, and portions of his deposition were read into evidence at trial, but the memo was never made an exhibit to the deposition, and the trial court refused to accept it into evidence when it was offered by the defendant in connection with its counterclaim.

Subsequent to his resignation, Westfall went to work for a company that is arguably in competition with BSG.

Westfall brought suit against BSG seeking payment of his commissions for the two years following his resignation. BSG counterclaimed for breach of the non-competition/non-disclosure agreement.

The evidence at trial showed that had Westfall remained in the employment of BSG, his pre-termination efforts would have resulted in commissions of $33,692.60 for the first year following his resignation and commissions of $18,633.18 for the second year.

At a bench trial, the court below (1) found Westfall's base pay to be a "draw against commissions" which "were earned when the client was signed up;" (2) awarded Westfall a judgment in the amount of $52,325.78; (3) dismissed BSG's counterclaim, finding that the non-competition/non-disclosure agreement "was an offer that was rejected and a counteroffer" which BSG did not accept; and (4) that there was "no proof that there is any information missing from the database or that [Westfall] was the one who wrongfully deleted any information."

BSG appeals, arguing that the trial court (1) erred in awarding Westfall post-resignation commissions; (2) erred in finding that the non-competition/non-disclosure agreement was never agreed to; and (3) erred in excluding BSG's memo relating to its reason for not allowing Westfall to work out a 30-day notice.

II.

In this non-jury case, our review is *de novo* upon the record, with a presumption of correctness as to the trial court's factual determinations, unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). The trial court's conclusions of law, however, are reviewed *de novo* with no presumption of correctness. *Campbell v. Florida*

***Steel Corp.***, 919 S.W.2d 26, 35 (Tenn. 1996); ***Presley v. Bennett***, 860 S.W.2d 857, 859 (Tenn. 1993).

III.

A.

BSG first argues that the trial court erred in awarding Westfall post-resignation commissions. We believe applicable contract law supports the trial court's judgment.

The goal of contract interpretation is to ascertain the intent of the parties according to the usual, natural, and ordinary meaning of the words used by the parties. ***Guiliano v. Cleo, Inc.***, 995 S.W.2d 88, 95 (Tenn. 1999). "The interpretation placed upon a contract by the parties thereto, as shown by their acts, will be adopted by the court." ***Hamblen County v. City of Morristown***, 656 S.W.2d 331, 335 (Tenn. 1983). Interpretation of a contract, being a matter of law, is subject to a *de novo* review on appeal with no presumption of correctness. ***Guiliano***, 995 S.W.2d at 95.

The parties' arguments concerning the payment of post-employment commissions rest on their respective and competing characterizations of Westfall's base pay. BSG asserts that Westfall's base pay of $36,000 was "salary," while Westfall contends that his base pay was an "advance," or "draw," against commissions. Because of the way the parties operated under their agreement, we find that his base pay was a draw against commissions.

The agreement refers to Westfall's base pay at one place in the document as "salary/commission" and at two other places as a "base/draw." That being said, we find and hold that the parties treated Westfall's base pay not as salary, but as a draw or advance against commissions. Under clear precedent, *see* ***Hamblen County***, 656 S.W.2d at 335, we adopt the parties' interpretation of the nature of Westfall's base pay as evidenced "by their acts." ***Id***. Westfall testified that he received a check for his base pay each week. If his commissions exceeded the amount of his base pay, he would receive an additional check for his commissions. If, however, his commissions fell below his base pay, a deficit would be recorded and carried forward to the next pay period. Though Westfall would receive another check for his base pay the next pay period, he would not qualify for a commission check unless and until he made up the cumulative deficit. Significantly, BSG's controller testified to the same compensation scheme. We therefore find that Westfall's base pay was not a salary, but rather an advance against commissions.

With respect to the more specific question of whether the trial court erred in awarding Westfall post-employment commissions, we find that this question is controlled by the language of the agreement and our decision in ***Winkler v. Fleetline Products, Inc.***, 859 S.W.2d 340 (Tenn. Ct. App. 1993). In ***Winkler***, the plaintiff sued his former employer to recover post-termination commissions. ***Id***. at 340-41. The parties had orally agreed that the plaintiff would procure customers for the defendant and that the defendant would pay, after the customers paid the defendant, a 10% commission to the plaintiff on work the defendant performed for these customers.

*Id*. at 341. The parties operated under this arrangement for approximately a year and a half, until the defendant terminated the plaintiff. *Id*. The record reflected that the defendant's motivation for terminating the agreement was that it was satisfied with the amount of business it had and with its ability to service the existing accounts, and therefore, "saw no reason to continue to pay out 10% commission on a regular basis to plaintiff." *Id*. at 343. We awarded the plaintiff commissions on orders placed after his termination by customers he procured for the defendant prior to his termination. *Id*.

Westfall, like the plaintiff in *Winkler*, was to receive his commissions after the customers he procured for BSG paid his employer. Nowhere does the agreement relieve BSG of its obligation to pay Westfall these commissions upon Westfall's resignation. We find and hold that, because there was no explicit or implicit agreement to the contrary, BSG is obligated to pay Westfall his post-employment commissions pursuant to the unconditionally-stated language of the contract. *Winkler* supports this result.

BSG attempts to distinguish *Winkler*, asserting that its rationale -- that an employer should not be allowed, in bad faith, to obtain for itself the full benefits of a salesperson's labor without paying the latter's commissions -- is not applicable to a case where, as here, an employee voluntarily resigns. In support of this argument, BSG cites us to *Pacesetter Properties, Inc. v. Hardaway*, 635 S.W.2d 382 (Tenn. Ct. App. 1981), a case in which, according to BSG's argument, the plaintiff's resignation operated to deny him entitlement to post-employment commissions. *Pacesetter*, however, did not involve the question of whether the parties had an agreement as to the payment of post-employment commissions. Rather, the question at issue in that case was whether the plaintiff was the procuring cause of the transaction which was consummated after his resignation. *Id*. at 385. We found for the defendant, not because the plaintiff's employment ended due to resignation rather than termination, but because the transaction for which the plaintiff claimed entitlement to a commission was due to new, independent negotiations rather than the result of the plaintiff's efforts. *See id*. at 389.

Nowhere in the parties' agreement is there any indication that resignation invalidates the defendant's obligation to pay commissions, an obligation which, as we have previously pointed out, is stated in unconditional terms in the writing before us. The agreement says simply that Westfall is to be paid commissions for two years on customers he procured for BSG. It does not provide that BSG's obligation to pay these commissions to Westfall ceases to exist upon Westfall's termination, voluntary or otherwise. Westfall's job was to "sign-up" customers, *i.e.*, persuade them to enter into a contractual relationship with BSG. That he received his commissions over time does not change the fact that they were earned at the time of the execution of the customer-BSG contract. Because they were already earned, it is immaterial under the agreement whether Westfall's employment was terminated at his initiation or at BSG's.

BSG next argues that the trial court erred in awarding post-employment commissions to Westfall because Westfall "was paid a base salary regardless of what he generated in sales, and

because commissions which he might have earned in each of the two years he claims [BSG] owes him fell below his base salary threshold of [$36,000] a year."

This argument, again, improperly characterizes Westfall's base pay as salary. Because we have found that it is properly characterized as an advance against commissions, the argument must fail. Upon resigning, Westfall gave up his entitlement to a weekly pay check. Expanding on this thought, the proof is clear that he was no longer entitled to a regular paycheck of a guaranteed amount *with the risk of his commissions falling below his base pay being on BSG*. His resignation did not, however, deprive him of that which he had already earned, *i.e.*, his actual commissions.

For the foregoing reasons, we find and hold that the trial court did not err in awarding post-employment commissions to Westfall.

B.

BSG next argues that the trial court erred in finding that the non-competition/non-disclosure agreement was not the agreement of the parties. More specifically, it argues that its placement of the modified agreement into Westfall's employment file, coupled with its retention of Westfall as an employee, constituted an acceptance of Westfall's counteroffer.

"Under general principles of contract law, a contract must result from a meeting of the minds of the parties in mutual assent to the terms." **Sweeten v. Trade Envelopes, Inc.**, 938 S.W.2d 383, 386 (Tenn. 1996) (internal quotations omitted). Acceptance of an offer must be exactly and precisely in accord with the terms of the offer. **Ray v. Thomas**, 232 S.W.2d 32, 35 (Tenn. 1950). If an offeree assents to an offer, but only with conditions or with varied terms, there is no acceptance, but rather the expression constitutes a rejection of the original offer and initiation of a new offer. *See* **Tullahoma Concrete Pipe Co. v. T.E. Gillespie Constr. Co.**, 405 S.W.2d 657, 665 (Tenn. Ct. App. 1966) ("Where a person offers to do a definite thing, and another accepts conditionally or introduces a new term into the acceptance, his answer is either a mere expression of willingness to treat, or it is a counter proposal, and in neither case is there an agreement.") (quoting **Canton Cotton Nills v. Bowman Overall Co.**, 149 Tenn. 18, 31, 257 S.W. 398, 402 (1924)). Moreover, silence or inaction generally does not constitute acceptance of an offer, unless the circumstances indicate that such an inference of assent is warranted. **Smith v. Murray**, 311 S.W.2d 591, 595 (Tenn. 1958).

We find that the trial court did not err in finding the non-competition/non-disclosure agreement to be unenforceable. BSG's tender of the typewritten agreement to Westfall constituted an offer. Westfall, by modifying the agreement, rejected the initial offer and made a counteroffer. Westfall testified at trial that he was told that the modifications were unacceptable. We are of the opinion that the circumstances were not such that BSG's silence and inaction creates a reasonable inference of assent, and we therefore hold that the trial court did not err in finding the "agreement" unenforceable.

C.

Finally, BSG argues that the trial court erred in excluding from evidence the memo relating to events allegedly occurring immediately after Westfall's resignation. This issue relates to BSG's counterclaim alleging that Westfall breached the non-competition/non-disclosure agreement. Because we have found that there is no such agreement, there can be no breach, and this issue is therefore rendered moot.

IV.

The judgment of the trial court is affirmed. This case is remanded for enforcement of the trial court's judgment and for collection of costs assessed below, all pursuant to applicable law. Costs on appeal are taxed to the appellant.

_____
CHARLES D. SUSANO, JR., JUDGE